**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

HOWARD ITEN,

*Plaintiff-Appellant*,

v.

COUNTY OF LOS ANGELES,

*Defendant-Appellee*.

No. 22-55480

D.C. No.
2:21-cv-00486-
DDP-JEM

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted April 10, 2023
Seattle, Washington

Filed August 30, 2023

Before: Jay S. Bybee and Danielle J. Forrest, Circuit
Judges, and Andrew P. Gordon,[*] District Judge.

Opinion by Judge Bybee;
Partial Concurrence by Judge Gordon

---

[*] The Honorable Andrew P. Gordon, United States District Judge for the District of Nevada, sitting by designation.

## SUMMARY[**]

### Standing/Contracts Clause

The panel reversed the district court's dismissal for lack of standing of commercial property landlord Howard Iten's complaint alleging that the County of Los Angeles' 2020 eviction moratorium, enacted following the outbreak of COVID-19, violated his rights under the Contracts Clause of the United States Constitution.

The moratorium provided tenants with an affirmative defense against eviction if they gave monthly notice to the landlord that they were unable to pay rent. The district court found that because Iten's tenant did not provide the required monthly notice or offer extenuating circumstances for failing to do so, Iten was free to evict his tenant and did not suffer an injury traceable to the moratorium.

The panel held that Iten had standing to bring his Contracts Clause claim. Iten's injury for Article III purposes did not depend on whether Iten's tenant provided notice or was otherwise excused from doing so. Those questions went to the merits of the claim rather than Iten's standing to bring suit. Iten alleged that the moratorium impaired his contract with his tenant because it altered the remedies the parties had agreed to at the time they entered into the lease. The panel held that these allegations were sufficient to plead an injury in fact and to state a claim under the Contracts Clause, and remanded to the district court for further proceedings.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring in part, Judge Gordon disagreed that Iten plausibly alleged an injury-in-fact simply because the moratorium imposed additional terms. Moreover, there were factual questions about the lease that made remanding with a direction that Iten had standing premature. Because the district court raised the issue of standing sua sponte and the parties did not fully brief the issue, Judge Gordon would reverse the district court's order dismissing the case with prejudice and remand for further development of the standing issue.

## COUNSEL

Kathryn D. Valois (argued), Pacific Legal Foundation, Palm Beach Gardens, Florida; Lawrence G. Salzman and Damien M. Schiff, Pacific Legal Foundation, Sacramento, California; for Plaintiff-Appellant.

Edward L. Xanders (argued) and Timothy T. Coates, Greines Martin Stein & Richland LLP, Los Angeles, California; Andrew Baum and Jesse B. Levin, Glaser Weil Fink Howard Jordan & Shapiro LLP, Los Angeles, California; Sayuj Panicker, Senior Deputy County Counsel, Transportation Division; Dawn R. Harrison, Interim County Counsel; Los Angeles County Counsel's Office, Los Angeles, California; for Defendant-Appellee.

## OPINION

BYBEE, Circuit Judge:

In early 2020, following the outbreak of COVID-19, Los Angeles County passed the "Resolution of the Board of Supervisors of the County of Los Angeles Further Amending and Restating the Executive Order for an Eviction Moratorium During Existence of a Local Health Emergency Regarding Novel Coronavirus (COVID-19)" (the "Moratorium"). The Moratorium imposed temporary restrictions on certain residential and commercial tenant evictions. Moratorium § IV (July 14, 2021). It provided tenants with new affirmative defenses to eviction based on nonpayment of rent, prohibited landlords from charging late fees and interest, and imposed civil and criminal penalties to landlords who violate the Moratorium. *Id*. § V (July 14, 2021). Howard Iten, a commercial landlord, sued the County, arguing that the Moratorium impaired his lease, in violation of the Contracts Clause of the U.S. Constitution. U.S. Const. art. I, § 10, cl. 1. The district court found that Iten had not alleged an injury in fact and dismissed his complaint for lack of standing. We reverse and remand.

I

In March 2020, Los Angeles County declared a state of emergency due to the COVID-19 pandemic and issued an Executive Order that imposed a temporary moratorium on evictions for nonpayment of rent by tenants impacted by COVID-19. In April 2020, the Board expanded the Executive Order to include all incorporated cities within the County. Moratorium § IV(B). The County extended the Moratorium's end date several times and made other alterations that are immaterial to the case before us.

The Moratorium did not prohibit property owners from filing evictions in accordance with State law, but it provided tenants with an affirmative defense against eviction. *Id*. § X(C). The Moratorium provided that "[a] Tenant shall not be evicted for nonpayment of rent, late charges, interest, or any other fees accrued if the Tenant demonstrates an inability to pay rent . . . due to Financial Impacts Related to COVID-19." *Id.* § V(A)(1). To demonstrate such inability, the Tenant must have provided "notice to the Landlord within seven (7) days after the date that rent and/or such related charges were due, unless extenuating circumstances exist, that the Tenant is unable to pay." *Id.* For commercial tenants with nine employees or fewer, the tenants "may provide, and Landlords must accept, a self-certification of inability to pay rent." *Id*. § V(B)(2). The Moratorium also provided tenants with a year-long forbearance period after the Moratorium ends to pay overdue rent. *Id*. § V(C)(2). Additionally, the Moratorium prohibited the collection of late fees and interest for overdue moratorium-period rent. *Id*. § VII. It also prohibited landlords from harassing tenants, which was defined, in part, as attempting to evict tenants who are protected by the Moratorium "based upon facts which the Landlord has no reasonable cause to believe to be true or upon a legal theory which is untenable under the facts known to the Landlord." *Id*. § VIII(I). Landlords who failed to comply with the Moratorium are subject to criminal and civil penalties, including fines of up to $5,000 per day. *Id*. § X(A)–(C).

According to the complaint, Iten is a mechanic and retired auto repair shop owner. He is part-owner of a 2,600-square-foot commercial property located in Los Angeles County. In August 2015, Iten executed a five-year lease agreement, renting the property to a commercial tenant, who

then subleased the space to an auto repair franchisee (the Tenant), who has fewer than ten employees. In April 2020, the Tenant notified Iten that he was "very adversely [a]ffected by Covid 19" and stopped paying rent. The Tenant paid no rent between April and August of 2020. With the five-year lease set to expire in August 2020, Iten negotiated a new five-year lease with the Tenant that included a promise to pay the back rent as well as future rent. The new lease commenced on September 1, 2020. The Tenant continued not paying rent.

In January 2021, Iten brought suit for declaratory relief under 28 U.S.C. §§ 2201–22 and for damages under 42 U.S.C. § 1983 on the grounds that the Moratorium violated his rights under the Contracts Clause. U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts."). Iten alleged that the Moratorium unreasonably impairs the obligations of his lease agreement with the Tenant. Specifically, Iten claimed that because of the Moratorium, he was prohibited from evicting his Tenant and attempting to recover past rent, late fees, or interest. He also claimed that at the end of the lease, he "would have preferred to end his business relationship with the Tenant," but that he "concluded [because of the Moratorium] that he had no prudent course of action open to him other than to negotiate a new lease with the Tenant so as to increase the chances of someday recovering the past-due rent."

The County moved to dismiss Iten's complaint, arguing that the Moratorium did not actually prohibit Iten from evicting his Tenant. The County argued that because the Tenant failed to provide monthly notices of his inability to pay rent or, alternatively, failed to articulate extenuating circumstances excusing him from providing those notices,

the Tenant would not have qualified for the affirmative defense provided by the Moratorium.  Iten was therefore free to evict the Tenant, and the Moratorium therefore did not injure Iten.  The district court agreed and dismissed Iten's complaint for lack of standing but granted leave to amend.

Iten inquired from his Tenant whether there were extenuating circumstances to excuse the Tenant from making the monthly notices.  The Tenant responded that, "yes" there were extenuating circumstances, and that the Tenant did not believe the Moratorium required him to provide monthly notices.  With this new information, Iten amended his complaint.

The County again moved to dismiss, this time on the merits.  The district court, sua sponte, raised the standing issue once more.  The court reasoned that "if the Moratorium does not prevent [Iten] from evicting his tenant, then . . . the Moratorium cannot have caused [Iten] any injury, and he lacks standing to bring suit."  Because Iten failed to allege that the "[T]enant gave timely notice of his inability to pay rent" or that the Tenant "specifically identified extenuating circumstances excus[ing] the [T]enant's failure to give notice . . . [,] the Moratorium's protections did not apply to [the Tenant]" and Iten "could not allege that the Moratorium caused him any injury."  The district court concluded that Iten lacked standing to bring his suit.  "Having dismissed for lack of jurisdiction," the district court declined to reach Iten's claims under the Contracts Clause.

## II

The district court's dismissal without leave to amend is a final, appealable order. *Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511, 1514–15 (9th Cir. 1987).  We review de novo an order granting a motion to dismiss for lack of standing.

*Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 416–17 (9th Cir. 2020). We assume all Iten's allegations to be true and draw all reasonable inferences in his favor. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

### III

We will begin with a discussion of standing and then consider how to apply those rules in the context of a claim brought under the Contracts Clause.

### A

Article III of the Constitution limits the "judicial Power" of the federal courts to "Cases, in Law and Equity, arising under this Constitution[ and] the Laws of the United States." U.S. Const. art. III, § 2, cl. 1. This provision, commonly referred to as the "case-or-controversy" requirement of Article III, is an independent constraint on the jurisdiction of federal courts. The "case-or-controversy" requirement states "fundamental limits on federal judicial power in our system of government. The Art. III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines." *Allen v. Wright*, 468 U.S. 737, 750 (1984); *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997). Accordingly, as the district court recognized, federal courts have a duty to raise, sua sponte, questions of standing before addressing the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). To establish standing, a plaintiff must show (1) an "injury in fact," (2) a "causal connection between his injury and the conduct complained of," and (3) that his injury will "'likely' . . . be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 561 (1992)

(quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976)).

"[I]njury in fact [is] the '[f]irst and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Steel Co.*, 523 U.S. at 103). An injury in fact must be both "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). A "particularized" injury must be personal, not a "generalized grievance." *Southcentral Found.*, 983 F.3d at 417 (quoting *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009)). Moreover, the injury must be "concrete," meaning that "it must actually exist. . . . 'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete." *Spokeo*, 578 U.S. at 340.

The district court below, and the parties on appeal, have operated on the premise that Iten's standing to bring a claim under the Contracts Clause turns on whether the Tenant gave Iten proper notice under the Moratorium, and, alternatively, "the availability to Iten's tenant of the extenuating circumstances exception to the [M]oratorium's monthly notice requirement." Accordingly, the parties have suggested different interpretations of the term "extenuating circumstances" to argue why the Tenant does or does not qualify. Iten, for example, argues that the Tenant's misinterpretation of the Moratorium counts as an "extenuating circumstance[]" to excuse him from otherwise providing monthly notices. The County argues that the Tenant's mistake of law is not a qualifying "extenuating circumstance[]." But arguments from both sides over whether the Tenant actually qualifies for the Moratorium's

protections are arguments about how the Moratorium affects Iten's rights as landlord.

Standing concerns who can bring a challenge to a particular law; it is an inquiry into whether and how the law in question affects the party who has brought the suit. The injury-in-fact inquiry seeks to assure that the plaintiff is not an intermeddler, generally unhappy with the law, but without any particular stake in the outcome. Whether the party can ultimately prevail in the suit is an entirely different question. A well-pleaded complaint typically has a demand for relief, which follows from the plaintiff's "short and plain statement" of how the defendant has injured him. *See* Fed. R. Civ. P. 8(a). On a motion to dismiss, the district court may conclude that the plaintiff has failed to state a claim upon which relief can be granted, *id.* 12(b)(6); on summary judgment, the court may determine that there are no disputes of material fact and defendant is entitled to judgment as a matter of law, *id.* 56(a); or, after trial, the trier of fact may decide that the plaintiff has failed to prove his case and may take nothing from the suit. In all three of these instances, this may mean that the plaintiff did not suffer redressable injury; it inevitably means that the plaintiff will, in fact, recover nothing. We might say, conversationally, that the plaintiff was not in fact injured. But when the jury, for example, returns a verdict for the defendant, the court does not dismiss the case for lack of standing. Even if the jury determined that any damages were zero, the fact that the court can award no relief does not mean that the court lacked jurisdiction to hear the case. Although a merits question may look similar to the standing question of whether there is an injury in fact traceable to the relevant law under which the plaintiff has brought suit, confusing the two "conflate[s]

standing with the merits." *Lazar v. Kronche*, 862 F.3d 1186, 1198–99 (9th Cir. 2017).

The difference between demonstrating injury in fact for standing and compensable injury to prevail on the merits is reflected in the rules of procedure. At the pleading stage, jurisdictional rules are addressed under Federal Rule of Civil Procedure 12(b)(1), while the failure to state a claim upon which relief may be granted—whether on the merits or because of a procedural rule—is governed by Rule 12(b)(6). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("Though lack of *statutory* standing requires dismissal for failure to state a claim [under Federal Rule of Procedure 12(b)(6)], lack of *Article III* standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."). The difference between the two rules is not merely academic. Many rules can be waived or forfeited by the parties, but jurisdictional rules—such as Article III standing—may be raised "at any time." Fed. R. Civ. P. 12(h)(3); *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006).

Iten brought his complaint under the Contracts Clause. He did not allege that either the Moratorium or California landlord-tenant law created his cause of action. His claim is brought directly under the Constitution; the relief he seeks is a declaratory judgment under 28 U.S.C. § 2201 and damages under 42 U.S.C. § 1983. *See S. Cal. Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam) (recognizing that Contracts Clause claims may be brought under § 1983). "Although standing in no way depends on the merits of the plaintiff's [case] . . . , it often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citation omitted). In order to understand whether Iten has standing to bring his Contracts

Clause claim against the County, we will need to understand the nature of claims under the Contracts Clause.

B

The Contracts Clause has no common-law or state-law antecedent. It first appeared in the Northwest Territory Ordinance of 1787, which Congress adopted in July 1787, just weeks before the constitutional convention began in Philadelphia. *See* Matthew J. Hegreness, Note, *An Organic Law Theory of the Fourteenth Amendment: The Northwest Ordinance as the Source of Rights, Privileges, and Immunities*, 120 Yale L.J. 1820, 1825 n.8 (2011); Denis P. Duffey, Note, *The Northwest Ordinance as a Constitutional Document*, 95 Colum. L. Rev. 929, 938, 960 (1995). Article II of the Ordinance provided in relevant part:

> And, in the just preservation of rights and property, it is understood and declared, that no law ought ever to be made or have force in the said territory, that shall, in any manner whatever, interfere with or affect private contracts, or engagements, bona fine, and without fraud previously formed.

An Ordinance for the Government of the Territory of the United States North-West of the River Ohio, art. II (1787). The provision in the Northwest Ordinance was a response to the recently-concluded Shays' rebellion, which was a protest over the enforcement of hard-money debts. In the post-Revolutionary War era, many states adopted "debt moratoriums; laws allowing debts to be paid in gradual installments despite contrary terms of the contract; . . . and laws requiring creditors to accept paper money . . . as legal tender." Michael W. McConnell, *Contract Rights and*

*Property Rights: A Case Study in the Relationship Between Individual Liberties and Constitutional Structure*, 76 Calif. L. Rev. 267, 280–81 (1988).  During this period "[m]ost states had . . . passed at least some temporary legislation designed on behalf of private debtors, most commonly laws postponing the collection of debts."  Forrest McDonald, *E Pluribus Unum: The Formation of The American Republic 1776–1790*, 322 (2d ed. 1979); *see Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 454–64 (1934) (Sutherland, J., dissenting) (reviewing the history of the Contracts Clause); Douglas W. Kmiec & John O. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hast. Const. L.Q. 525, 533 (1987) ("State debtor relief legislation . . . was one of the major evils that the Clause was designed to eradicate.").

The Contracts Clause was the most litigated constitutional provision in the nineteenth century.  *See Barnitz v. Beverly*, 163 U.S. 118, 121 (1896) ("No provision of the [C]onstitution of the United States has received more frequent consideration by this [C]ourt than that which provides that no state shall pass any law impairing the obligation of contracts.").  As the Court explained the Clause in *Sturges v. Crowninshield*, a contract consisted of two elements, the "agreement" and "the obligation."  17 U.S. (4 Wheat.) 122, 197 (1819).  The "agreement" simply meant that the contracting parties agreed that each will "undertake[] to do, or not to do, a particular thing."  *Id.*  The "obligation of [] contract" was the "law bind[ing] [the party] to perform his undertaking," and "[a]ny law which releases a part of this obligation, must . . . impair it."  *Id.*  The Contracts Clause protected the integrity of the contract as of the time that it was negotiated.  States were free to change their laws, but those laws would apply to future contracts only.  As the

Court explained in *Ogden v. Saunders*, the state law at the time of the contract "whether . . . written or unwritten . . . is emphatically the law of the contract made within the State, and must govern it throughout, wherever its performance is sought to be enforced." 25 U.S. (12 Wheat.) 213, 259 (1827); *see Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 84 (1823) ("Any deviation from [the contract's] terms, by postponing, or accelerating, the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however minute, or apparently immaterial, in their effect upon the contract of the parties, impairs its obligation.").

*Bronson v. Kinzie*, 42 U.S. (1 How.) 311 (1843), provides a good example of a case applying these principles. As a result of the Panic of 1837, many states passed debtors' relief legislation to assist property holders who were losing their farms and homes through foreclosure. Illinois passed two laws regulating the foreclosure of mortgaged property. The first of these provided that property sold by execution could be repurchased by the debtor within one year at the purchase price plus ten percent. The second law provided that the foreclosed property could not be sold at auction for less than two-thirds of its appraised value. *Id.* at 312. Bronson challenged the retroactive effect of these two laws, arguing that they impaired his mortgage contract with Kinzie. The Court agreed with Bronson: The effect of the laws was "to deprive the party of his pre-existing right to foreclose the mortgage by a sale of the premises, and to impose upon him conditions which would frequently render any sale altogether impossible." *Id*. at 320. "[S]uch modification of a contract by subsequent legislation, against the consent of one of the parties, unquestionably impairs its obligations, and is prohibited by the Constitution." *Id*.

Strict application of the Contracts Clause ended in the Minnesota Moratorium case, *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934). *See Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 912 (9th Cir. 2021) ("*Blaisdell* marked the beginning of the Supreme Court significantly curtailing the Contracts Clause's prohibitive force."). In *Blaisdell*, the Court rejected a Contracts Clause challenge to a Great Depression-era state law suspending foreclosures. *Blaisdell*, 290 U.S. at 416, 447. The Court recognized "a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare." *Id*. at 442. The modern approach to the Contract Clause now considers not only whether the law impairs the obligation of the contract, but asks how "substantial" that impairment is and whether the state law is an "appropriate" and "reasonable" use of state police power. *See Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018) (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983)). Although, post-*Blaisdell*, a Contracts Clause claim analysis requires additional inquiries, the merits of a Contracts Clause claim has *always* started with whether or not there is a change in a law (an "obligation") that has impaired the original agreement of the parties.

## C

We have recounted this history, because mortgage moratoria were, from the beginning, at the heart of the Contracts Clause. A law affecting or changing the terms the parties previously agreed to is the quintessential example of what the Contracts Clause was designed to prohibit. Whether, after the Court's reformation of the Contracts Clause in *Blaisdell*, landlords or mortgage holders can

prevail on a Contracts Clause claim is irrelevant to whether they have standing to bring such an action. In simple words, Iten has alleged that the Moratorium impaired his contract with his Tenant because it altered the "Obligation of [the] Contract[]"—the remedies the parties had agreed to, consistent with California landlord-tenant law at the time they entered into the lease. In his amended complaint, Iten pleaded:

> Because of the eviction moratorium, Mr. Iten is prohibited from evicting, or attempting to evict, his Tenant for failing to pay in full and in a timely fashion under the lease. Further Mr. Iten is prohibited from charging late fees or interest, as well from attempting to recover back-rent that came due during the eviction moratorium period until twelve months following the moratoriums expiration—currently September 30, 2022.
>
> But for the eviction moratorium, Mr. Iten would immediately initiate eviction proceedings to gain possession of his property and seek other remedies available to collect rent and other amounts due from his Tenant.

Iten's complaints about the Moratorium are not theoretical. Iten alleged that the Moratorium "substantial[ly]" impairs commercial lease contracts "because [it] significantly limit[s] the remedies available to commercial landlords, such as Mr. Iten, when tenants breach their commercial leases, and dramatically undercut the economic value and security of those contracts."

At oral argument, the County candidly admitted that its Moratorium not only applied to Iten, but that it was leases like the Iten-Tenant lease that the Moratorium was designed to reach.  Oral Arg. at 15:55–16:26.  The County's forthright admission follows from the face of the Moratorium.  Section V declared "[a] temporary moratorium on evictions of Tenants."  Section III(K) defined "Tenant" as "Tenants of commercial property," while Section III(D) defined "Landlord" to include "An owner of real property . . . for commercial rental purposes."  The Moratorium then set forth in great detail new, temporary restrictions on Tenant evictions.  It could not be clearer that the Moratorium applied to commercial landlords like Iten and restricted the remedies he thought he could employ.

The district court focused narrowly on the question of whether Iten could, in fact, successfully evict his Tenant under the Moratorium.  As the court analyzed it, "if the Moratorium does not prevent [Iten] from evicting his tenant, then as a matter of course, the Moratorium cannot have caused [Iten] any injury, and he lacks standing to bring suit." With respect, we think this is not the right question.  To show injury and causation for standing purposes, Iten need not allege that he would have been able to evict his Tenant "but for" the Moratorium.  Nor need he show that his Tenant qualifies for the affirmative defense provided by the Moratorium.  Rather, Iten need only allege that the Moratorium imposed additional rights, remedies, conditions, or procedures that impair the obligations to which he and his Tenant had contracted.  Iten has made that showing here.  He has alleged that Los Angeles County changed the framework for his lease with his Tenant by creating an additional affirmative defense for the Tenant, enacting a year-long forbearance period for unpaid rent, prohibiting Iten from

charging late fees or interest, and adding civil and criminal penalties beyond those previously provided under California landlord-tenant law.  Furthermore, the value of a commercial property is often tied to the value of its leases.  Iten alleged that the Moratorium "undercut the economic value and security of [his commercial leases]."  Thus, so long as the Moratorium was in effect, the economic value of Iten's property, as influenced by the value and strength of the leases of that property, was diminished, and "[a] specific, concrete, and particularized allegation of a reduction in the value of property owned by the plaintiff is sufficient to demonstrate injury-in-fact at the pleading stage." *Barnum Timber Co. v. EPA*, 633 F.3d 894, 898 (9th Cir. 2011).

The district court was concerned with whether the Tenant had given Iten sufficient notice under the Moratorium to qualify as a defense to eviction. Section V(A) of the Moratorium required tenants to give notice to the landlord of the inability to pay rent "within seven (7) days after the date that rent and/or such related charges were due, unless extenuating circumstances exist." Iten pleaded that the Tenant gave him oral notice that he was "adversely [a]ffected by Covid 19" and would "not be able to pay the rent."  The district court faulted Iten for not pleading that he had received timely notice from his Tenant, or that his Tenant had extenuating circumstances excusing timely notice; without the proper notice, according to the district court, Iten *was* entitled to evict the Tenant and, therefore, was not subject to the Moratorium.

We have several observations.  First, the district court was applying the terms of the Moratorium itself to Iten—a near sure sign that Iten was subject to the Moratorium and had standing to challenge its constitutionality. *See Lujan*, 504 U.S. at 561–62 (where "the plaintiff is himself an object

of the action . . . at issue . . . there is ordinarily little question that the action . . . has caused him injury"). Second, at this stage of the proceedings, it was improper to speculate how a California court would have responded to an eviction action brought by Iten. In effect, the district court declared that Iten would have prevailed in an eviction action because the Tenant did not give him proper notice. This proves too much, as it effectively gave Iten a green light to evict the Tenant. This is a surprising result from a proceeding in which the Tenant was not a party. If, in a subsequent proceeding, the California courts took a different view, Iten would be subject to inconsistent rulings. Even worse, if Iten tried to evict the Tenant, the Tenant might have had a civil action for harassment under Section X of the Moratorium, which could cost Iten up to $5,000 per day; in the extreme, Iten could have been subject to administrative fines and criminal penalties as well. Moratorium §§ IX, X. Third, we cannot see that the adequacy of the Tenant's notice is itself a jurisdictional prerequisite for an eviction action in California. Iten thought the notice was adequate; if anyone had the right to enforce a strict notice requirement, it is Iten. At least in federal court, objections to procedural requirements can be waived or forfeited. *See* Fed. R. Civ. P. 12(h)(1). A California court might well conclude that Iten waived the formalities of notice under the Moratorium. *See, e.g.*, *Kern Sunset Oil Co. v. Good Roads Oil Co.*, 6 P.2d 71, 73–74 (Cal. 1931) ("The acceptance of rent by the landlord from the tenant, after the breach of a condition of the lease, with full knowledge of all the facts, is a waiver of the breach."); *Sosin v. Richardson*, 26 Cal. Rptr. 610, 613 (Cal. Ct. App. 1962) ("A condition is waived when a promisor . . . justifies the promisee in believing that a conditional promise will be performed despite the failure to perform the

condition, and the promisee relies upon the promisor's manifestations to his substantial detriment."). Even if we considered a notice requirement to be similar to an exhaustion-of-remedies requirement, "an exhaustion requirement . . . is a quintessential claim-processing rule," and is not jurisdictional. *Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1112 (2023). Finally, the district court's speculation misconceives the nature of a Contracts Clause claim. Iten is protesting the fact that he even has to run the gauntlet of additional procedures that were not in place when the Tenant signed the lease.

In any event, if the adequacy of the Tenant's notice is relevant at all, it is better addressed as a question going to the merits rather than to Iten's standing to bring suit. Any question of whether Iten can successfully evict his Tenant might be relevant to "whether the state law has 'operated as a *substantial* impairment of a contractual relationship.'" *Sveen*, 138 S. Ct. at 1821–22 (emphasis added) (quoting *Allied Structural Steel Co v. Spannaus*, 438 U.S. 234, 244 (1978)). In other words, whether the state law impairs Iten's ability to evict the Tenant—and whether the Tenant qualified for the Moratorium's protection—are important questions. But such questions go to the first step in a Contracts Clause merits analysis, not standing. And whether Iten "will be successful on the merits in [his] suit against [the County] does not affect whether [Iten] has standing to pursue such a suit."[1] *Barnum Timber Co.*, 633 F.3d at 901 n.4.

---

[1] The County also argues that Iten lacks standing because any claimed injury was "self-inflicted" because Iten voluntarily chose to enter into a new lease with the Tenant after the Moratorium had been in place. Iten alleges he was forced to do so because "he had no prudent course of action open to him other than to negotiate a new lease" and did so "to

D

There are few cases dealing with standing to bring a Contracts Clause action, but we think that those cases that do exist reinforce these principles.  In *Lazar v. Kroncke*, Kroncke established an individual retirement account (IRA), in which he named Lazar, his wife, as his beneficiary.  862 F.3d 1186, 1192 (9th Cir. 2017).  They later divorced, and Kroncke subsequently died.  *Id.*  Meanwhile, Arizona passed a revocation-on-divorce statute, which automatically revoked a beneficiary's interest upon divorce.  *Id.*  The statute applied retroactively back to the time the IRA was established.  *Id.* at 1193.  The administrator of Kroncke's estate made a demand for the IRA proceeds, relying on Arizona's revocation-on-divorce statute.  *Id.* at 1192.

Lazar brought suit, challenging the statute as a violation of the Contracts Clause.  Lazar claimed that the statute interfered with her contractual right to the IRA funds.  *Id.* at 1198.  The lower court dismissed for lack of standing because Lazar merely possessed an expectation interest in the IRA.  *Id.*  We disagreed with the district court, finding that the court has "conflated standing with the merits."  *Id.* We held that Lazar had standing for her Contracts Clause claim because the revocation-on-divorce statute "operated to extinguish Lazar's valid expectancy interest in the IRA—an

---

increase the chances of someday recovering the past-due rent."  In general, parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).  More particular to Contracts Clause claims, a "statute cannot be said to impair a contract that did not exist at the time of its enactment." *Texaco, Inc. v. Short*, 454 U.S. 516, 531 (1982).  We leave to the district court to determine whether the timing of the Moratorium, and its various amendments, substantially impaired Iten's leases with his Tenant.

injury which is actual, concrete, and particularized." *Id.* at 1198–99. We proceeded to decide the case on the merits, and ultimately held there was no substantial contractual impairment because "Lazar never possessed a vested contractual right," and she therefore "suffered no contractual impairment." *Id.* at 1200; *see also Greene v. Dayton*, 806 F.3d 1146, 1150 (8th Cir. 2015) (finding that the complaint did not adequately allege a violation of the Contracts Clause; implicitly rejecting defendant's claim that plaintiffs lacked standing).

Several courts have considered standing to bring Contracts Clause challenges to COVID-related moratoria. Recently the Southern District of New York considered the standing of landlords to challenge a COVID-era law that made personal liability guaranties for commercial leases unenforceable for rent not paid between March 2020 and June 2021. *Melendez v. City of New York*, ___ F. Supp. 3d ___, ___, No. CV-5301, 2023 WL 2746183 (S.D.N.Y. Mar. 31, 2023). The court held that the landlords had standing. *Id.* at *6–7. As to injury in fact, the court observed that the law "invalidated Plaintiffs' bargained-for contract rights," and that "by being forced to recoup expected rent payment by alternative means, Plaintiffs demonstrate[d] precisely the kind of 'direct and personal stake in the controversy' that the injury-in-fact inquiry seeks to answer." *Id.* at *6. The Southern District of California reached a similar conclusion with respect to landlords challenging eviction moratoria in San Diego. *Bols v. Newsom*, 515 F. Supp. 3d 1120, 1131 (S.D. Cal. 2021). The court concluded that a moratorium lasting "even as little as 29 days is a

sufficient time to impose an actual injury." *Id.* at 1131;[2] *see also Grano v. Rappahannock Elec. Coop.*, 552 F. Supp. 3d 563, 571–72 (W.D. Va. 2021) (plaintiffs had standing under the Contracts Clause to challenge a law relieving easement holders from paying compensation to plaintiff-landowner for installation of broadband equipment).  On the other hand, in *Case v. Ivey*, an Alabama district court concluded that the plaintiffs lacked standing to sue under the Contracts Clause where COVID-19 restrictions, such as masking and social distancing, discouraged customers from keeping their monthly chiropractic memberships but did not require cancellation of the contracts.  542 F. Supp. 3d 1245, 1264–65 (M.D. Ala. 2021).  In that case, the court found that any injury was not traceable to the health measures but to the independent actions of third parties, namely, the chiropractor's customers.  *Id.* at 1265; *see also Bochese v.*

---

[2] We note that courts around the country have considered whether COVID-19 eviction moratoria violate the Contracts Clause.  These cases have involved landlords subject to state and local moratoria, and nearly all have been decided on the merits.  *See*, *e.g.*, *Apartment Ass'n of Los Angeles Cnty.*, 10 F.4th at 913–17 (affirming the denial of a preliminary injunction because the Apartment Association was unlikely to succeed on the merits of their Contracts Clause claim); *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 729 n.8 (8th Cir. 2022), *rehearing denied*, 39 F.4th 479, 481 (8th Cir. 2022) (holding that the plaintiff plausibly alleged a Contracts Clause claim and recognizing that this decision conflicts with *Apartment Ass'n*, 10 F.4th 905); *see also Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 224–25 (D. Conn. 2020) (concluding that the state moratorium did not "operate as a substantial impairment of [the plaintiffs'] contractual rights" because it did not "eliminate [the plaintiffs'] contractual remedies for evicting nonpaying tenants"); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381–87 (D. Mass. 2020) (similar); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 349–53 (E.D. Pa. 2020) (similar); *Elmsford Apartment Associates, LLC v. Cuomo*, 469 F. Supp. 3d 148, 168–72 (S.D.N.Y. 2020) (similar).

*Town of Ponce Inlet*, 405 F.3d 964, 984–85 (11th Cir. 2005) (holding that the plaintiff lacked standing to raise a Contracts Clause claim based on rescission of a contract between a town and a developer where the plaintiff was neither a party to nor an interested beneficiary of the contract); *TF-Harbor, LLC v. City of Rockwall*, 18 F. Supp. 3d 810, 818–22 (N.D. Tex. 2014) (holding that the plaintiffs did not have standing under the Contracts Clause to challenge an ordinance regulating property development where the plaintiffs were not the property owner and would suffer economic injury from independent action of a third party).

Here, we conclude that the district court conflated constitutional injury with contractual impairment. Iten's injury for Article III purposes does not depend on whether the Tenant provided notice or was otherwise excused from doing so. Nor would it depend on the Tenant's decision to raise (or not raise) the Moratorium as an affirmative defense in an unlawful detainer proceeding. For purposes of standing, Iten alleged facts sufficient to state a claim that he suffered an injury traceable to the Moratorium for purposes of standing: He alleged that he was a commercial landlord living in Los Angeles County; that both he and the Tenant believed that the Moratorium applied to their lease agreement; and that the Moratorium altered the terms of his contract with his Tenant. Iten alleged that the Moratorium limited the legal procedures he may take to evict his Tenant for nonpayment of rent; that it prevented him from charging late fees or interest, which his lease otherwise allows him to do; and that it imposed additional penalties that chilled his ability to test the viability of eviction. In sum, Iten, at least for purposes of filing a complaint, has alleged that the obligations of his contract had been "taken away or materially lessened." *Lynch v. United States*, 292 U.S. 571,

580 (1934). That is sufficient to state a claim under the Contracts Clause. *See Sveen*, 138 S. Ct. at 1822 (stating that a Contracts Clause claim considers "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights").

## IV

Iten has standing to bring his Contracts Clause claim. He has pleaded facts sufficient to demonstrate that he has suffered an injury in fact that is traceable to the County's Moratorium. We express no view on the merits of Iten's claim. We reverse the judgment and remand to the district court for further proceedings.[3]

**REVERSED and REMANDED.**

---

GORDON, J., concurring in part.

I do not agree with the principle implicit in the majority opinion that Iten and every other landlord in the county had standing to challenge the Moratorium the instant it went into effect because the Moratorium "imposed additional rights, remedies, conditions, or procedures that impair the obligations" to which the landlords and their tenants did not agree. A plaintiff asserting a Contracts Clause claim must show an injury-in-fact to satisfy Article III standing, just as any other plaintiff would. An injury-in-fact "cannot be conjectural or hypothetical." *See Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (quotation omitted). But the majority's theory would confer standing on a landlord whose tenant

---

[3] We deny the County's requests for judicial notice as moot.

never stopped paying rent even though that landlord did not suffer a concrete, particularized, non-hypothetical injury from any of the Moratorium's provisions. Article III standing requires more.

In addition, as the majority opinion recognizes in footnote one, we lack sufficient information regarding when the Moratorium went into effect vis-à-vis when Iten voluntarily chose to enter into a new lease with the Tenant. As a result, Iten has not plausibly alleged he has standing because if he entered into the new lease after the Moratorium went into effect, then the Moratorium cannot plausibly be a change in the law impairing his contract and he would not have adequately alleged an injury-in-fact. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934) (noting "existing laws [are] read into contracts in order to fix obligations as between the parties"); *Olson v. California*, 62 F.4th 1206, 1221 (9th Cir. 2023) (stating that a Contracts Clause claim requires a change in the law that impaired a contractual relationship). Consequently, remanding with a direction that Iten has standing is premature.

Assuming for the moment that the new lease was signed before the Moratorium went into effect, Iten still might lack standing. Iten alleged that, but for the Moratorium, he would seek to "collect rent and other amounts due from his Tenant." The section of the Moratorium that prohibits landlords from collecting interest or late fees does not specify that it applies only to tenants who are entitled to eviction protection. Therefore, even if Iten's Tenant failed to provide adequate notice to come within the Moratorium's eviction protection, Iten may have standing to challenge the fee prohibition based on both his inability to collect interest and late fees and the resulting potential impact on his commercial property's value. On the other hand, reading the

Moratorium as a whole may lead to the conclusion that all of its protections apply only to tenants who are entitled to eviction protection.  In that case, Iten may not have standing to challenge the fee prohibition because he has not plausibly alleged that his Tenant qualified for the Moratorium's protections.  The record is unclear on this point because Iten never argued below or on appeal that regardless of whether his Tenant qualified for eviction protection, he had standing because he was prohibited from collecting late fees and interest.  Rather, he argued that he had sufficiently alleged that his Tenant was entitled to protection under the eviction moratorium.[1]  As a result, standing based on the fee prohibition was not addressed by the parties or the district court.  This is an additional reason why it is appropriate to remand the standing issue to the district court for further analysis.

Because the district court (properly) raised the standing issue sua sponte during a hearing on the County's motion to dismiss, the parties did not fully brief standing, and it is not clear that amendment would be futile.  Iten may be able to plausibly allege facts giving him standing to challenge the Moratorium's various provisions.  Thus, I would reverse the district court's order dismissing the case with prejudice and remand for further development of the standing issues.[2]

---

[1] *See* Appellant's Opening Br. at 2, 11 (stating that the "moratorium's protections are triggered" when a tenant provides the required notice of financial impacts related to COVID-19, and that the "causal connection between the County's moratorium and Iten's injuries-in-fact turns upon the availability to Iten's tenant of the extenuating circumstances exception to the moratorium's monthly notice requirement").

[2] Dismissal with prejudice is improper in any event because dismissal for lack of subject matter jurisdiction is not an adjudication on the merits.

No further development of the standing issue is needed under the majority opinion, as it holds that Iten has standing. Yet after finding that he has standing, the majority does not address whether Iten has plausibly alleged a claim. The County's motion giving rise to this appeal argued that Iten failed to plausibly allege a claim. Whether a complaint plausibly states a claim is a question of law. *Heimrich v. Dep't of the Army*, 947 F.3d 574, 577 (9th Cir. 2020); *see also Tahara v. Matson Terminals, Inc.*, 511 F.3d 950, 955 (9th Cir. 2007) (stating we "may affirm the district court for any reason supported by the record"). Iten raised the issue in his opening brief, it has been fully addressed by the parties, and there is no need for factual development below to determine whether the amended complaint plausibly alleged a violation of the Contracts Clause. If Iten has standing, judicial economy weighs in favor of the majority deciding the issue.

I therefore concur in the decision to remand, but I do not agree that Iten has plausibly alleged standing on this record.

---

*Hampton v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017) ("Dismissals for lack of subject-matter jurisdiction . . . must be without prejudice, because a lack of jurisdiction deprives the dismissing court of any power to adjudicate the merits of the case.").